Michael L. JOHNSON,
Plaintiff-Appellant,

v.

SECRETARY OF HEALTH AND
HUMAN SERVICES,
Defendant-Appellee.

No. 84–1223.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 6, 1986.
Decided July 7, 1986.

---

Granner S. Ries (argued), Sachs, Nunn, Kates, Kadushin, O'Hare, Helveston & Waldman, Detroit, Mich., for plaintiff-appellant.

Robert Martinez, Asst. U.S. Atty., Bay City, Mich., Janet Parker (argued), Roy C. Hayes, U.S. Atty., Detroit, Mich., for defendant-appellee.

Before MERRITT, JONES and NELSON, Circuit Judges.

NATHANIEL R. JONES, Circuit Judge.

Michael L. Johnson appeals the district court's decision upholding the denial of Social Security disability benefits. On consideration of the record, briefs and arguments of the parties, we reverse and remand this case to the Secretary for reconsideration.

Johnson was born in March 1944 and has an eighth-grade education. In May 1980, Johnson strained his back trying to lift a heavy object at work. He never returned to his job as a laborer and in June 1982 applied for disability benefits on the basis of chronic myositis and arthritis in his back.

After his injury at work in 1980, Johnson visited a chiropractor, but after a week he did not improve sufficiently and was admitted to Lapeer County General Hospital in June 1980. The preliminary diagnosis was acute back strain from lifting, herniated lumbar disc, obesity, and some edema in the ankles. Johnson was five feet, nine inches tall and weighed 275 pounds. Dr. Lawrence Holen observed a 50% loss of flexibility in bending, which was related to a lumbar muscle spasm.

After numerous studies, the doctors found all discs and vertebrae to be normal and intact. The x-rays showed "no evidence of traumatic or degenerative pathology" of the lumbar spine. The edema subsided because Johnson was not on his feet, and it was thus determined that the edema was due to poor venous return as a result

of obesity. Chest x-rays confirmed Johnson's statement regarding his medical history that half of his right lung had been removed several years before. Blood tests showed a mild elevation of blood sugar, cholesterol and tri-glycerides.

Conservative treatment of the back problems led to "good resolution of back symptoms." Because Johnson's diastolic blood pressure was repeatedly at 90, Dr. P.A. Gorelick prescribed medication. The doctor stated that the blood pressure should be controlled by the medication. An examination of the extremities revealed no clubbing or varicosities. The final diagnosis was lumbosacral strain, borderline diabetes mellitus, and exogenous obesity with hyperlipidemia. Johnson was eventually discharged "in good condition."

Johnson continued to visit Dr. Holen after his discharge from the hospital. The doctor stated that after the June 1980 hospitalization, there was "gradual resolution" of Johnson's medical problems, although Johnson continued to complain of back pain. In July 1980, Dr. Holen told Johnson that he could return to work "with restrictions." Dr. Holen last saw Johnson in August 1980, and stated that x-rays showed "normal back" and an examination showed "normal neuro."

In February 1982, Johnson was admitted to Lapeer Hospital with complaints of chest pains. Dr. Thompson's impression on February 9, 1982 was as follows: "Anxiety Syndrome, Chronic Back injury, Obesity, Pan Sinusitis, Rule out Diabetes Mellitus, and Sinusitis." Johnson weighed 314 pounds.

On February 11, Dr. Thompson listed the final diagnosis: exogenous obesity, labile hypertension, and diabetes mellitus. The doctor found "grade 1 pretibial" edema on the left extremity but no edema on the right. The treatment during this hospital stay was a 500-calorie-per-day diet and valium. On discharge, the only prescribed treatment was a 500-calorie diet; the record shows no prescription for any medication.

In March 1982, Johnson was treated as an outpatient for back pain and possible diabetes. A treadmill test was done with a stress EKG, the results of which appear to be in the normal range.

In August 1982, Johnson visited Dr. Vladimir Schwartsman, a consultative physician for the Social Security Administration. The doctor found Johnson to weigh over 330 pounds. He stated that Johnson could walk with no list or discomfort and could bend over forwards with fingertips 15 cm. from the floor. Bending over was "difficult to perform" but Johnson "did not have any problems" bending over. Straight leg raising was 80 degrees with some back "discomfort." X-rays of the spine showed no abnormalities although there were some "degenerative changes compatible most likely with his overweight." The doctor said that the major problem was extreme obesity, which "reflects on" his back problems. *Id.* The doctor thought the back pain was not "spondylogenic," that is, caused by the spine or vertebrae.

Dr. Schwartsman, an orthopedic surgeon, stated that he believed that "disability is mainly derived from his overweight" and that he did not believe "that a man of his size can perform any duties for a long time without difficulties."

Dr. Herbert Rackliff, a general practitioner, was apparently Johnson's treating physician for many years. In October 1982, the Social Security Administration sent Rackliff a form to complete. Dr. Rackliff had last examined Johnson two or three weeks before, and his diagnosis was that Johnson had hypertension, chronic myositis [inflammation of the muscle] of the lumbar spine, and arthritis and degeneration of the lumbar spine. No results of clinical studies were provided. Dr. Rackliff was asked to provide examples of difficulty in walking, sitting, arising, standing or attending to personal needs. He answered that Johnson "has marked limitation of motion of the lumbar spine" and "has marked difficulty in walking, sitting, arising, standing, lifting, [and] pushing." Next, Dr. Rackliff was asked to describe the level of

activity that produces any shortness of breath or fatigue, if any. The doctor did not describe any level of activity, but merely stated that Johnson "has marked difficulty in breathing due to excessive obesity." The doctor indicated on the form that no pulmonary function tests were done. Three recent blood pressure readings showed diastolic pressure at 94, 98 and 92.

In response to a question about chest discomfort, the doctor answered that "All chest distress is due primarily to the extreme obesity." The doctor left unanswered all the questions regarding the details of the chest discomfort. The doctor failed to answer the question regarding deep venous return and responded that neither of the venous tests had been done. Next, the form asked the doctor to describe the findings, if any, of extensive brawny edema. The doctor indicated that edema was present in both left and right sides, but failed to describe it. In response to questions about dermatitis and varicosities, the form indicated that these symptoms were not observed.

At the time of the hearing in April 1983, Johnson was 39 years old. He testified that he could stand on his feet for only fifteen to twenty minutes at a time and that he could walk fifty yards at the most before he experienced difficulties with his legs, back and breathing. He testified that he needed help in dressing himself, but could occasionally drive a short distance by himself.

Johnson described a problem with cement poisoning of his feet caused by standing in wet cement as a construction worker, and stated that his feet were chronically swollen and infected. He said that the condition prevented his wearing shoes and that he could wear only slippers. He also said that he was unable to wear socks because the material got into the deep cracks in the skin, and that sometimes the cracked areas would bleed. He explained that he could not stand on his feet long due to this condition and that a Dr. Maltrupp (phonetic) had indicated that there was no treatment to cure the problem. The record includes no report from this doctor, nor does the record include reports from Dr. Latrell or Lackley, whose treatments were described by Johnson at the hearing.

Johnson testified that he takes several Empirin and several Darvon each day for back pain in addition to his medication for hypertension and water retention. He stated that a gastrointestinal bypass has been recommended, but indicated that he was unable to pay for the operation.

The administrative law judge found that Johnson was not engaged in substantial gainful activity and that Johnson had a severe impairment as defined in 20 C.F.R. § 404.1520(c). The ALJ further found that Johnson satisfied the weight requirement in the listing for obesity, § 10.10 of Appendix 1, but that Johnson did not satisfy the second requirement of the listing, which requires specific findings in regard to at least one of several other listed disorders. The ALJ stated, however, that Johnson did have a "marked limitation of motion and does have documented evidence of arthritis and chronic myositis." ALJ Decision at 5–6.

The administrative law judge found that Johnson could not return to his former employment as a laborer, but that he had a residual functional capacity for sedentary work. In making this finding, the ALJ relied on Dr. Holen's 1980 permission to return to work with restrictions; Dr. Schwartsman's 1982 observation that Johnson could walk and bend and his conclusion that there was no disability deriving from a back abnormality; and Johnson's own response to a question in which he said he could try to work as a cashier in a self-service gas station. Considering Johnson's age, education, work experience, and residual functional capacity, the ALJ determined that Johnson was not disabled within the meaning of the Act, pursuant to 20 C.F.R. § 404.1569 and Rule 201.24, Table 1, App. 2, Subp. P.

## I.

The regulations governing disability determinations by the Social Security Admin-

istration set forth a series of steps for determining whether a claimant is disabled. The first of these sequential inquiries is whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 404.-1520(b) (1985). If the claimant is not so engaged, the second question is whether the claimant has a severe impairment, which is an impairment or combination of impairments that significantly limits the ability to do basic work. 20 C.F.R. § 404.-1520(c). If a severe impairment is found, the next inquiry is whether the impairment has disabled the claimant.

The Secretary has provided a Listing of Impairments, and if a claimant's impairment is equal to a listed impairment and the impairment also meets the durational requirement, the Secretary "will find [the claimant] disabled without considering [his] age, education, and work experience." 20 C.F.R. § 404.1520(d). If the impairment does not meet the criteria in the listing, that does not mean the person is not disabled. The next inquiry under the regulations is to ascertain whether the claimant can perform his past relevant work, and if not, to determine the claimant's residual functional capacity. 20 C.F.R. §§ 404.-1520(e), 404.1545. The residual functional capacity is then considered together with the claimant's age, education, and work experience in determining whether the claimant is disabled. 20 C.F.R. §§ 404.-1520(f), 404.1560–65; Tables 1–3, App. 2, Subpt. P.

One of the listed impairments is obesity. The listing requires that two factors be present: (1) weight that equals or exceeds a specific level, which for this claimant, who is 5'9" tall, is 310 pounds; and (2) *one* of the following conditions:

A. History of pain and limitation of motion in any weight bearing joint or spine (on physical examination) associated with X-ray evidence of arthritis in a weight bearing joint or spine; or

B. Hypertension with diastolic blood pressure persistently in excess of 100 mm. Hg measured with appropriate size cuff; or

C. History of congestive heart failure manifested by past evidence of vascular congestion such as hepatomegaly, peripheral or pulmonary edema; or

D. Chronic venous insufficiency with superficial varicosities in a lower extremity with pain on weight bearing and persistent edema; or

E. Respiratory disease with total forced vital capacity equal to or less than 2.0 L. or a level of hypoxemia at rest equal to or less than the values of the following tables:

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 10.10 (1985) (tables omitted).

The first issue in this case is whether Johnson's impairments meet the criteria listed in section 10.10. It is clear that as of February 1982, Johnson's weight of 314 pounds satisfied the primary criterion of section 10.10, which is the weight level. In addition, he must satisfy one of five listed conditions.

*A. Joint or spine.* Johnson's back problems appear to satisfy the requirements of pain and limitation of motion, but the regulation also requires "x-ray evidence of arthritis." One doctor, Dr. Rackliff, said there was arthritis, but did not state any observations or clinical findings. The x-rays taken by Dr. Schwartsman indicated "degenerative changes," which Johnson claims is an x-ray indication of arthritis. He also cites the statement by the ALJ that Johnson has a "marked limitation of motion" and "documented evidence of arthritis."

*B. Hypertension.* Johnson's records show diastolic pressure readings consistently in excess of 90, but not in excess of 100, as required.

*C. Congestive heart failure.* The medical records show no evidence of congestive heart failure.

■ *D. Venous insufficiency.* The record shows that when Johnson is on his feet, he develops edema in the lower extremities. When he is off his feet, the edema subsides. Edema alone is not enough, however, to satisfy this criterion.

The regulation requires a finding of "Chronic venous insufficiency with superficial varicosities," in addition to pain when the lower extremity bears weight. The medical record does not contain findings of varicosities, although there was some evidence of venous insufficiency.

*E. Respiratory disease.* To satisfy this criterion, the test for vital capacity or hypoxemia must yield certain numerical results, which are listed on a table. Although Dr. Rackliff stated that Johnson had difficulty breathing due to his obesity, he provided no information or tests concerning vital capacity or hypoxemia.

It appears that Johnson may satisfy subsections A, D or E. The record was insufficient, however, to determine whether Johnson actually satisfied those criteria or not. Moreover, the ALJ's statements appear contradictory in regard to whether Johnson satisfied the requirements for arthritis. We cannot ascertain what Dr. Schwartsman meant by "degenerative changes," nor can we understand how the ALJ could find that none of the subsections were satisfied when he found that Johnson suffered from marked limitation of movement and documented arthritis.

■ In sum, we find the ALJ's findings defective in two respects. First, the ALJ failed to develop the factual record fully and fairly. *See Lashley v. Secretary of Health and Human Services,* 708 F.2d 1048, 1051–52 (6th Cir.1983); *Decker v. Harris,* 647 F.2d 291, 299 (2d Cir.1981). The lack of clear medical evidence, in light of the impairments suggested by the physicians, prevented fair review of Johnson's claim. Second, the ALJ made findings that appear contradictory, as discussed above.

## II.

■ The second issue is whether obesity may serve as the basis for a finding of disability, in view of the regulation on remediability. The Secretary argues that, because Johnson was told by his doctors to lose weight and was prescribed a 500-calorie-per-day diet, his failure to lose weight precludes any finding of disability. The

general rule is that an impairment that can be remedied by treatment with reasonable effort and safety cannot support a finding of disability. *Henry v. Gardner,* 381 F.2d 191 (6th Cir.1967) (interpreting 20 C.F.R. 404.1502(g), which is no longer in effect). The current regulation provides as follows:

§ 404.1530. Need to follow prescribed treatment

(a) What treatment you must follow. In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work.

(b) When you do not follow prescribed treatment. If you do not follow the prescribed treatment without a good reason, we will not find you disabled....

20 C.F.R. § 404.1530. This provision goes on to describe good reasons for not following prescribed treatment. The reasons include religious beliefs, and the magnitude or danger of surgery. *Id.*

The Secretary cites two cases to support his argument. In *Weber v. Harris,* 640 F.2d 176 (8th Cir.1981), the claimant originally was found disabled due to low back degenerative arthritis and borderline pulmonary dysfunction. For three years following this determination, during which she received benefits, the claimant visited her physician only once and took no medication except aspirin and an occasional pain pill. On a review of the claimant's status, the Secretary terminated benefits because the impairment was no longer severe. The reviewing ALJ noted the lack of treatment and added that the medical evidence demonstrated that the back pain was caused by chronic poor posture, which was in turn caused by the claimant's "obesity, which is a remediable condition which cannot be the basis for a finding of disability." *Id.* at 178 (citing 20 C.F.R. § 404.1518, which was the then-current section regarding the failure to undertake treatment). In affirming the denial of benefits, the Eighth Circuit did not cite or refer in any way to the provision in the Listing of Impairments that deals specifically with obesity. That regulation, section 10.10 of Appendix 1, was promul-

gated in March 1979, one month after the ALJ's decision, which was rendered in February 1979. Thus, the *Weber* court's finding that obesity, accompanied by obesity-related problems, could not be a disabling impairment was based on a set of regulations that has not been in effect since 1979. Indeed, the court's language conflicts with section 10.10, which clearly sets forth the circumstances under which obesity is considered a disabling impairment. We thus cannot rely on *Weber*.

In *Stillwell v. Cohen*, 411 F.2d 574 (5th Cir.1969), the court affirmed the denial of benefits to a claimant who suffered from obesity and obesity-related conditions such as borderline diabetes and gout. The court agreed that the claimant "could improve his condition by losing weight and returning to work." *Id.* at 575. The court stated that "a reduction in weight would ease many of appellant's problems," and added that an impairment that can be remedied by reasonable means cannot support a finding of disability. *Id.* at 575–76. This case was decided in 1969, however, long before the obesity amendment to the regulations, and therefore is no longer an accurate representation of the law.

Thus we have an issue of first impression regardig whether obesity can be a disabling impairment under the Social Security regulations. We first examine the language of section 10.10. The introductory material in the regulation is instructive. It indicates that obesity-caused disorders are within the contemplation of the Act's coverage and that the Secretary recognizes that obesity by its nature can be expected to result in various restrictions and health problems:

> Long-term obesity will usually be associated with disorders in the musculoskeletal, cardiovascular, peripheral vascular, and pulmonary systems and the advent of such disorders is the major cause of impairment. Extreme obesity results in restrictions imposed by body weight and the additional restrictions imposed by disturbances in other body systems.

Pt. 404, Subpt. P., App. 1, § 10.00(B). This passage indicates that the *Stillwell* rationale is no longer valid, at least in regard to extreme obesity as defined in the tables in Appendix 1. We further note that section 10.10 makes no distinction between obesity that is the result of simple overeating and obesity that is caused by a physiological disorder or other problem.

We next turn to the history of the promulgation of section 10.10. The listing on obesity was introduced in 1979, with the following explanation:

> We provided criteria for evaluating obesity based upon its usual complications. These criteria require more than the documentation of those findings that are almost universally associated with marked obesity (e.g., peripheral edema, dyspnea on exertion). They require documentation of congestive heart failure (or a history of this) with peripheral edema (or other evidence of significant vascular congestion), respiratory disease, including a finding of dyspnea, with specified abnormalities of pulmonary function tests, etc.

44 Fed. Reg. 18175 (March 27, 1979). When the proposed rule was published, one commenter stated that the criteria for obesity would have little effect because the required findings are sufficient to establish disability without obesity. The Secretary's response was as follows:

> The criteria under this section do have to have some relationship to similar impairments described under other body systems. However, they also take into account the contributing complication of obesity when it reaches the extremes specified by the tables. For example, the subsection dealing with arthritis of a weight-bearing joint does not require evidence of the advanced joint pathology required in the comparable section in the musculoskeletal section. We omitted this criterion for the obese person because we recognize the decreased ability of an impaired joint to bear the stress produced by extreme obesity. We also concede that joint pathology associated

with extreme obesity will progress rapidly.

*Id.*

■ It is clear from the language of section 10.10 and its promulgative history that obesity is a condition that can support a finding of disability. The listing for obesity is quite specific and includes no reference to types of obesity. Section 10.10 reflects a policy decision by the agency that obesity, regardless of type, can be a disabling impairment when it is severe and is accompanied by certain complications. It would not make sense for the regulatory scheme to include a specific regulation on obesity if a general regulation on treatment could entirely negate it, and we must attempt to construe the regulations so that they make sense. It is also a well established rule of construction that a later, more specific, provision must prevail over an earlier, more general provision if there appears to be a conflict. Few if any claimants could satisfy section 10.10 if the mere possibility of losing weight, however remote or theoretical, could render the claimant ineligible. The Secretary argues that obesity is *per se* remediable; it is impermissible, however, to presume that obesity can be remedied. *See Harris v. Heckler,* 756 F.2d 431, 436 n.2 (6th Cir.1985); *Stone v. Harris,* 657 F.2d 210, 212 (8th Cir.1981). Furthermore, this court has stated that physicians' recommendations to lose weight do not necessarily constitute a prescribed course of treatment, nor does a claimant's failure to accomplish the recommended change constitute a refusal to undertake treatment. *Harris v. Heckler,* 756 F.2d at 436 n.2.

In this case, neither the ALJ nor the Appeals Council denied the disability because Johnson's obesity is remediable under section 404.1530. The record contains nothing regarding whether Johnson's obesity is "reasonably remediable *by [him].*" *See Stone,* 657 F.2d at 212 (emphasis in original). In order for an impairment that would otherwise produce a finding of disability to be declared treatable, there must be a factual basis and findings of fact on

the issue. The Secretary must show that the disability is clearly treatable. In the absence of such findings, we are unable to agree with the government's post hoc rationale based on treatability.

### III.

The third issue is the significance of satisfying the criteria in the Listing of Impairments. The Secretary argues that, even if Johnson meets the listing's criteria in section 10.10, the Secretary may still find that he is nevertheless able to work. This is an important argument, as it calls into question the whole meaning and function of the Listing of Impairments.

### A. *Applicable Regulations*

20 C.F.R. § 404.1520(d) states that when a claimant's impairments meet the durational requirement and are listed in the Listing of Impairments, the Secretary "will find you [the claimant] disabled without considering your age, education, and work experience." Section 404.1511 states that one definition of a disabling impairment is

an impairment (or combination of impairments) which, of itself, is so severe that it meets or equals a set of criteria in the Listing of Impairments in Appendix 1....

Furthermore, in 20 C.F.R. § 404.1525(a), which states the "Purpose of the Listing of Impairments," the Secretary states that the listing "describes ... impairments which are considered severe enough to prevent a person from doing any gainful activity." The language of these regulations indicates that the Secretary intended that, when a claimant satisfies the listed criteria, the claimant is to be found disabled without further consideration.

### B. *Promulgative History*

In 1979, the Social Security Administration overhauled the Listing of Impairments. The Secretary's discussion of these regulations during rule-making procedures is somewhat illuminating.

From the beginning of the disability program in 1955, we have had a list of

medical impairments with sets of signs, symptoms and laboratory findings which, if present in a person applying for disability benefits, are sufficient to justify a finding that he or she is disabled, *unless there is evidence to the contrary.* These criteria are known as the Listing of Impairments (the Listing)....

The Listing includes medical conditions frequently found in people who file for disability benefits. It describes for each of the 13 major body systems, impairments that are severe enough to prevent a person from engaging in substantial gainful activity and which may be expected to result in death or which have lasted or can be expected to last for a continuous period of not less than 12 months.

44 Fed.Reg. 18170–71 (March 27, 1979) (emphasis added).

The Listing describes a level of severity which *permits* us to reasonably conclude that a person who has an impairment described in the Listing and who is not working, is unable to work because of that impairment. Thus, if a person's impairment or combination of impairments equals or exceeds the level of severity described in the Listing, we find that he or she is disabled on the basis of the medical facts, *unless we have evidence to the contrary;* for example, evidence that the person is actually doing substantial gainful activity.

*Id.* at 18171 (emphasis added). This language could be interpreted to mean that meeting the listing was intended to create an extremely strong presumption. However, the only example given of "evidence to the contrary" is gainful employment, which is a factor that would stop the present disability inquiry at step one, forestalling any consideration of the Listing of Impairments, which occurs at step three. Moreover, we note that the regulation as adopted did not include the "permits" or "unless" language in the final version, but used the phrase "will find."

■ The sequential process, including the use of the Listing of Impairments, was designed to simplify the task of the ALJs

and to provide uniformity of decision. *See, e.g., Farris v. Secretary of Health and Human Services,* 773 F.2d 85, 89 (6th Cir. 1985). While the Listing of Impairments does promote uniformity and simplicity, it also takes away a certain amount of case-by-case flexibility. The two appendices in Subpart P of Part 404, which contain the listings and the grids, demonstrate the Secretary's decision to sacrifice some flexibility for legitimate administrative goals. *Cf. id.; Kirk v. Secretary of Health and Human Services,* 667 F.2d 524, 530 (6th Cir. 1981), *cert. denied,* 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983). Therefore, if a claimant is not engaged in substantial gainful activity and also validly meets a listing, the Secretary must find claimant disabled without regard to residual work capacity, age, education, or experience. It is not correct under the regulatory scheme to find that a claimant satisfies a listing but is nonetheless able to work.

We order this case REMANDED to the Secretary for further consideration in light of this opinion.